**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| JOHN BRAND,<br><br>    individually and on behalf of all others<br>    similarly situated,<br><br>        Plaintiff,<br><br>            v.<br><br>KNORR-BREMSE AG<br><br>KNORR BRAKE COMPANY LLC<br><br>NEW YORK AIR BRAKE LLC<br><br>BENDIX COMMERCIAL VEHICLE<br>SYSTEMS LLC<br><br>WESTINGHOUSE AIR BRAKE<br>TECHNOLOGIES CORPORATION<br><br>FAIVELEY TRANSPORT S.A.<br><br>FAIVELEY TRANSPORT<br>NORTH AMERICA, INC.<br><br>RAILROAD CONTROLS, L.P.<br><br>WABTEC RAILWAY ELECTRONICS, INC.<br><br>XORAIL, INC.<br><br>        Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ...........................................................................................1

II.     JURISDICTION AND VENUE .........................................................................................2

III.    THE PARTIES....................................................................................................................3

IV.     THE MARKET FOR RAIL EQUIPMENT EMPLOYEES ................................................7

V.      THE DOJ INVESTIGATION...........................................................................................15

VI.     DEFENDANTS' CONSPIRACY TO LIMIT COMPETITION FOR SKILLED
        LABOR ..............................................................................................................................17

        A.      Wabtec-Knorr Agreement...................................................................................17

        B.      Knorr-Faiveley Agreement .................................................................................19

        C.      Wabtec-Faiveley Agreement ...............................................................................20

VII.    DEFENDANTS USED TRADE ASSOCIATIONS TO FURTHER THEIR
        CONSPIRACY ..................................................................................................................21

VIII.   CLASS ACTION ALLEGATIONS ..................................................................................22

IX.     EFFECTS OF DEFENDANTS' CONSPIRACY ON PLAINTIFF AND THE
        CLASS ...............................................................................................................................24

X.      PLAINTIFF'S CLAIMS ARE NOT LIMITED BY STATUTES OF LIMITATION ......25

XI.     VIOLATION OF SECTION 1 OF THE SHERMAN ACT ..............................................26

XII.    PRAYER FOR RELIEF ....................................................................................................28

DEMAND FOR JURY TRIAL. ...................................................................................................29

Plaintiff John Brand, individually and on behalf of a class of all those similarly-situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants Knorr-Bremse AG, Knorr Brake Company LLC, New York Air Brake LLC, Bendix Commercial Vehicle Systems LLC, Westinghouse Air Brake Technologies Corporation, Faiveley Transport S.A., Faiveley Transport North America, Inc., Railroad Controls, L.P., Wabtec Railway Electronics, Inc., and Xorail, Inc., based on Defendants' and unnamed co-conspirators' unlawful conspiracy to suppress Plaintiff's and Class members' compensation, and further alleges as follows:

## I.     SUMMARY OF THE ACTION

1.     This class action challenges an illegal conspiracy among the world's largest rail equipment suppliers to restrain competition in the labor markets in which they compete for the service of rail equipment employees.  Without the knowledge and consent of their employees, beginning in at least 2009, Defendants and senior executives at these companies entered into express agreements to eliminate or reduce competition amongst them for skilled labor ("No-Poach Conspiracy" or "Conspiracy").

2.     The intended and actual effect of the Conspiracy is to suppress employee compensation, and to impose unlawful restrictions on employee mobility.  During the relevant period, Knorr, Wabtec and Faiveley were the three largest rail equipment suppliers in the world and often each other's direct competitors.  Their employees possessed skills and experience that were particularly valuable to Defendants' business.  The no-poach agreements were an effective means of reducing competition for employees and contractors and suppressing employee and contractor pay below competitive levels.

3.     Defendants' Conspiracy is a per se violation of Section 1 of the Sherman Act, 15

U.S.C. § 1. Plaintiff accordingly brings this suit on behalf of himself and a putative class of employees and contractors who were paid for personal services by any of the Defendants, or their wholly owned subsidiaries, in the United States at any time from 2009 (the "Class"), for damages proximately caused by Defendants' Conspiracy, as well as for injunctive relief. Defendants are jointly and severally liable for all damages proximately caused to Plaintiff and the Class by their Conspiracy.

## II.    JURISDICTION AND VENUE

4.      Plaintiff brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

6.      Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more Defendant resides in, can be found in, and/or transacts business in this District.

7.      Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Maryland. In particular, each Defendant, either directly or through the ownership and control of its U.S. subsidiaries:  (a) transacted business throughout the United States, including in this District; (b) had substantial aggregate contacts with the United States as a whole, including in this District; (c) carried out conspiratorial schemes in the United States, including in this District; and/or

2

(d) engaged in an illegal conspiracy to restrain competition for rail-equipment employees that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District. Additionally, both Knorr and Wabtec have facilities and employees working in the state of Maryland.

8.    Throughout the relevant period, Defendants employed Class members throughout the United States, including in this District.

9.    The anticompetitive conduct engaged in by Defendants and their co-conspirators substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

10.    This anticompetitive conduct affected all workers and Class members employed by Defendants, not just individuals who would have been solicited. Labor competition in the rail and freight industry is nationwide. Defendants considered each other's compensation packages to be competitively relevant regardless of location, and many Class members may have moved between states to pursue employment opportunities.

11.    For these reasons, Defendants' conduct substantially affected interstate commerce throughout the United States, and caused antitrust injury throughout the United States.

## III.    THE PARTIES

12.    Plaintiff John Brand worked as an employee for Defendant New York Air Brake LLC during May 2013 to August 2016 in the position of Senior Manager of Systems & Software Engineering, in Irving, Texas. During his tenure at New York Air Brake LLC, Mr. Brand attained the American Society for Quality's certification as a Certified Software Quality Engineer, and managed over 20 professionals. Mr. Brand is a resident of Texas.

13.    While employed by Defendant New York Air Brake LLC, Mr. Brand applied for

3

employment at Wabtec as a Software Quality Manager.  Mr. Brand was not contacted by Wabtec in response to his application.

14.    Defendant Knorr-Bremse AG is a privately owned German company with headquarters in Munich, Germany. Knorr-Bremse AG is a leading manufacturer, developer, and seller of rail and commercial vehicle equipment, and holds several wholly-owned subsidiaries in the United States.  Knorr had annual revenue of $7.7 billion in 2017 and has approximately 28,000 employees worldwide.

15.    Defendant Knorr Brake Company LLC is a Delaware corporation with headquarters in Westminster, Maryland, and is a wholly-owned subsidiary of Defendant Knorr-Bremse AG.  It manufactures systems such as train control, braking, and door equipment used on passenger rail vehicles.

16.    Defendant New York Air Brake LLC is a Delaware corporation with headquarters in Watertown, New York, and is a wholly-owned subsidiary of Defendant Knorr-Bremse AG.  It manufactures railway air brakes and other rail equipment used on freight and passenger trains.

17.    Defendant Bendix Commercial Vehicle Systems LLC is a Delaware company with headquarters in Elyria, Ohio.  Bendix develops and supplies active safety technologies, air brake charging and control systems, and components for medium- and heavy-duty trucks, tractors, trailers, buses and other commercial vehicles.  It is a wholly-owned subsidiary of Knorr-Bremse AG.

18.    Unless otherwise specified, a reference to "Knorr" shall include each of Knorr-Bremse AG, Knorr Brake Company LLC, New York Air Brake LLC, and Bendix Commercial Vehicle Systems LLC.

19.     Defendant Westinghouse Air Brake Technologies Corporation (abbreviated as "Wabtec") is a Delaware corporation with headquarters in Wilmerding, Pennsylvania, and is a leading provider of freight and passenger rail equipment and services.  Wabtec Passenger Transit is a business unit of Westinghouse Air Brake Technologies Corporation, and is based in Spartanburg, South Carolina.

20.     Defendant Faiveley Transport North America, Inc., formerly a subsidiary of Faiveley Transport S.A., is now a wholly-owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina.  On November 30, 2016, Wabtec acquired Faiveley, which had been a French société anonyme based in Gennevilliers, France.  Prior to the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr.  It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016.  In the United States, Faiveley conducted business primarily through Defendant Faiveley Transport North America, Inc.  Various Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this Complaint.

21.     As of the date of the filing of this Complaint, Wabtec employed more than 18,000 full-time employees worldwide, and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.  Wabtec had global sales of $3.9 billion in 2017.

22.     Defendant Railroad Controls, L.P. was acquired by Defendant Wabtec on February 4, 2015, and now operates as a wholly-owned subsidiary of Wabtec.  Railroad Controls, L.P., with its principal place of business in Fort Worth, Texas, is a leading provider of railway signal construction services.

23.     Defendant Wabtec Railway Electronics, Inc. is a wholly-owned subsidiary of

Wabtec with its headquarters in Germantown, Maryland.  It designs, develops, manufactures and repairs electronic products used to improve railroad operations and safety.

24.    Defendant Xorail, Inc. is a Florida corporation with its headquarters in Pennsylvania. Xorail is a provider of signal, communications and positive train control engineering, and design, systems integrator, configuration management and construction services for the rail industry.  Xorail is a wholly-owned subsidiary of Wabtec.

25.    Unless otherwise specified, a reference to "Wabtec" shall include each of Westinghouse Air Brake Technologies Corporation, Faiveley Transport North America, Inc., Railroad Controls, L.P., Wabtec Railway Electronics, Inc., and Xorail, Inc.

26.    Each Defendant co-conspirator acted as the principal of or agent for each other Defendant co-conspirator with respect to the acts, violations, and common course of conduct alleged herein.

27.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and the identities of which are presently unknown, have participated as co-conspirators with the defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and entities at a later date.

28.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

29.     When Defendants engaged in conduct in relation to the No-Poach Conspiracy, they did not differentiate among the members of a corporate family.  For example, if a Defendant or a representative of a Defendant referred to "Knorr," all other Defendants understood that to refer to each of the Knorr Defendants named in paragraphs 14 through 17.

## IV.    THE MARKET FOR RAIL EQUIPMENT EMPLOYEES

30.     The U.S. railroad equipment manufacturing industry is highly concentrated, with the 50 largest companies, including Defendants Knorr and Wabtec, accounting for more than 95% of industry revenue.  Imported railroad equipment represents only about 5% of the U.S. railroad equipment market.

31.     Knorr and Wabtec are the world's leading rail equipment suppliers, are rivals in the development, manufacture, and sale of freight and passenger rail equipment, and compete with each other, including through subsidiaries, both worldwide and in the United States.  Before its acquisition by Wabtec, Faiveley was the world's third-largest rail equipment supplier and also competed for business with Knorr and Wabtec.

32.     In addition to competing for business, Defendants and their subsidiaries also compete with one another and with firms at other tiers of the rail-equipment industry supply chain to attract, hire, and retain skilled labor with rail industry experience by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

33.     There is a high demand for and limited supply of skilled employees who have rail industry experience.  As a result, firms in the rail industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening.

34.     The DOT's Federal Railroad Administration ("FRA") published a study on the

railroad industry workforce in October 2011.[1]  The study found that, as of 2010, a pending increase in demand coupled with an aging workforce nearing retirement may lead to shortages in qualified workers:

> In 2010, the railroad industry is anticipating a pending growth spurt fueled by a new national interest in green initiatives, monetary infusion through the American Recovery and Reinvestment Act of 2009, establishment of a high-speed rail system in the United States, and a host of other high-tech projects that stand to boost both safety and reliability across the railroad network. This increase in demand coupled with the probability of large numbers of retirees leaving the industry and an immature pipeline of talent flowing in to assume those vacated positions requires swift planning and collaboration on workforce issues for rail.

35.     The DOT FRA study further found that, particularly as to railway manufacturers and suppliers, the advancement of technology likely may exacerbate the shortage in qualified rail workers by necessitating skills in more specialized fields:

> As more technology is infused into the railroad industry, the need for increased integration of components and technologies also increases. This is fueling an increase in nontraditional skill sets such as electrical engineering, Radio Frequency (RF) engineers, and computer science disciplines.

36.     The DOT FRA published a railway workforce study update in April 2016.  The study update showed that an aging workforce with a shortage of qualified skilled replacements continues to be a challenge for the industry and a central concern of industry stakeholders, as shown below in Figure 1 from that study:

---

[1] U.S. Department of Transportation, Federal Rail Administration, "Rail Industry Modal Profile: An Outline of the Railroad Industry Workforce Trends, Challenges, and Opportunities" – October 2011.



**Figure 1: Railroad Industry Age Distribution in 2008, 2010 and 2012[2]**

37.     The study update confirmed the findings of the 2011 study as to shortages in skilled employees and indicated that rail companies are struggling to find potential employees that possess the appropriate science, technology, engineering, and mathematics ("STEM") skills and specialty skills possessed by certain professions like welders and electricians.[3]  At the largest and most sophisticated rail companies, there is always a need for recruiting of specialty and STEM disciplines, including composite employees – those with railroad experience coupled with technological savvy to handle new technologies as they are implemented.  The 2016 study update concluded that "[t]he railroad industry will encounter increased competition for talent while the current workforce challenges facing the industry . . . will become more important."[4]

---

[2] U.S. Department of Transportation, Federal Rail Administration, "Rail Industry Modal Profile: An Outline of the Railroad Industry Workforce Trends, Challenges, and Opportunities – Update," April 2016, at p. 1.
[3] *Id.* at p. 21.
[4] *Id.* at p. 24.

38.    Upon information and belief, Defendants' own hiring practices indicate that experience in the rail industry is required or highly preferred across a wide variety of employment and independent contractor positions.

39.    **Engineers:**  Defendants frequently need to hire or contract various types of engineers, from research and development, design, field testing, electronics hardware and software development, systems integration, to project engineering.  For example:

a.    Mechanical design engineers are typically primarily responsible for the design and development of, *e.g.*, rail brake or door system components.  Due to the bespoke nature of many such components, design engineers typically must generate component and assembly designs based on customer, as well as internal, specifications.  In addition to mechanical engineering degrees and experience, rail industry experience is usually highly preferred, if not a requisite, as design engineers are often required, for example, to provide manufacturing, purchasing, and quality support.

b.    Software engineers develop, test, and implement various rail software applications, including, *e.g.*, train control and monitoring software.  Such positions generally require a computer science or electrical engineering degree as well as years of experience in the railroad industry.  Jobs can require communication with customers and the FRA.  Defendants thus typically require that the employee or contractors understand railroad or rail transit operations, processes and procedures.

c.    Systems engineers include, *e.g.*, Reliability, Availability, Maintainability, and Safety engineers as well as train control and monitoring system developers and testers.  These positions generally require a strong technical understanding of an entire rail safety or efficiency system as well as an ability to communicate with rail industry customers and

10

development teams.  Thus, Defendants typically seek to fill the contracts with individuals who not only have systems engineering degrees but also have years of experience in the rail or rail transit industry.

d.      Project engineers, meanwhile, work closely with Marketing and Project Managers to deliver Defendants' components and systems to customers on particular projects.  In addition to requiring similar technical education, skills, and knowledge as for the other engineering positions described, Defendants generally place a particularly high premium on project engineers' ability to communicate with rail customers and the project team.

40.     In sum, in addition to degrees in the relevant engineering field, Defendants generally seek engineering candidates with experience in the industry, including familiarity with regulations, standards, and recommended practices specific to the rail and rail transit industry, such as those put out by the FRA, the Federal Transit Authority, the AAR, and AREMA.

41.     **Project Managers:** The primary responsibility of project managers at Defendant companies is to ensure an overall rail project and any related services are completed on time, within budget, and according to rail customer needs.  The project manager is the key liaison between the rail project team and the rail customer across the definition, development, field testing, rollout, claims management, and aftermarket maintenance support and stages of a rail project.  Specific responsibilities generally include coordinating, managing, and communicating (a) internal project plans and status, (b) change orders, (c) invoicing, and (d) contracts.  Core responsibilities such as setting, clarifying, and implementing the exact definition of delivery and scope of supply require extensive communication with the rail customer as well as close supervision of and coordination with engineers on the project team.  Thus, Defendants typically

require or strongly prefer that project managers have strong communication skills and fluency in the type of technical engineering projects they manage. As a result, these positions place high import on an employee's years of experience in the rail industry as well as their relevant engineering background and education (*e.g.*, systems engineering degree for a control systems project).

42.     **Sales Representatives:**  Sales representatives at Defendant companies are primarily responsible for making sales of Defendants' rail components, systems, or services to new and existing customer accounts. Their job duties often include developing business plans; collecting market intelligence; preparing proposals, bids, and quotes; and establishing and maintaining positive customer relationships and satisfaction. They are frequently the key point of contact responsible for interfacing with customers and technical representatives during the bid phase. Thus, Defendants often seek sales representatives who have, *e.g.*, a good technical understanding of the particular railway products or services they are selling and an "ability to communicate with a technically oriented customer." To meet that profile, Defendants typically seek candidates with engineering degrees and experience in or demonstrated knowledge of the rail or rail transit industry.

43.     Firms in the rail equipment industry employ a plethora of recruiting techniques, including using internal and external recruiters to identify, solicit, and otherwise assist in hiring potential employees. Firms also receive direct applications from individuals interested in potential employment opportunities.

44.     Directly soliciting employees from another rail equipment industry participant is a particularly efficient and effective method of competing for qualified employees. Direct solicitation often involves "cold calling," or communication directly with an individual who has

not otherwise applied for a position.

45.     Firms in the rail industry rely on direct solicitation or cold calling of employees of other rail companies because the skilled labor of other companies within the rail industry have the requisite specialized skills and may be unresponsive to other methods of recruiting. Moreover, the rail-equipment industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy.

46.     Compared to unemployed workers or employees actively seeking new employment, employees who are not actively seeking to change employers are more likely to be among the most sought-after employees. Because they are not looking for other jobs, they are difficult to reach without active solicitation.

47.     Through poaching, a company is able to save costs and avoid risks by taking advantage of the efforts its rival has expended in soliciting, interviewing, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, if each Defendant was truly acting in its own independent self-interest, it would solicit the others' employees, including through offers of increased employment benefits and pay.

48.     Cold calling and other employee poaching methods significantly impact employees' compensation in many ways.

49.     First, direct solicitation provides employees with valuable information about the labor market that they would not otherwise have, and thus also gives them leverage in negotiations. When an individual receives a cold call from a rival company with an offer that exceeds her current compensation, she can accept that offer and change employers, or she can use the offer to negotiate increased compensation from her current employer. Either way, she can use

the competition between the companies to increase her own compensation.

50.     Second, through cold calling a company also gathers information about the rival's compensation practices.  This increase in information and transparency regarding compensation has the effect of increasing compensation, in turn, because employers are pressured to match or exceed a rival's compensation package to recruit and retain quality skilled labor.

51.     Third, when a company anticipates that its employees will be cold called by its rivals and thus tempted to change employers, the company will preemptively increase compensation to reduce the risk of poaching.

52.     These effects are not limited to individuals who have received cold calls or applied for jobs at rival companies, but instead extend to all employees.  For example, an individual who has received a cold call and gained information about a rival's compensation can share that information with her colleagues, who can also use it to negotiate pay increases or obtain offers from the rival company, even though they did not receive cold calls themselves.

53.     Additionally, companies monitor and manage their internal compensation structures to achieve certain goals, such as maintaining approximate compensation parity among employees within the same job categories and certain compensation relationships across different job categories and levels of seniority.  To accomplish these and other objectives, including recruiting and retaining skilled labor, companies set baseline compensation levels for their various job categories.  These baseline levels are affected by the factors discussed above – so, for example, a company may be forced to increase a particular baseline compensation level if the affected individuals are being poached by rivals with better offers.  The reverse is also true:  if its employees are not being poached, a company can keep its baseline compensation at lower levels.

54.     When a company negotiates compensation with an individual, the negotiation is,

at the very least, profoundly influenced by the baseline compensation level. Accordingly, the suppression of baseline compensation results in the suppression of total compensation.

55.    In short, in a competitive labor market, rail industry employers compete with each other to attract highly skilled individuals. This competition benefits labor because it increases awareness of available job opportunities and improves an individual's ability to negotiate for a better salary and other terms of employment. These benefits extend to all, including those who do not intend to move between companies, because, among other things, employers have incentives to offer competitive baseline pay levels and maintain internal equity in their compensation structures.

56.    The no-poach agreements at issue disrupted these normal competitive mechanisms within the labor market for rail industry employees, harming competition and thus the Class members.

## V.    THE DOJ INVESTIGATION

57.    While anti-poaching agreements among competitors have always been unlawful under the antitrust laws, in October 2016, the Antitrust Division of the United States Department of Justice and the Federal Trade Commissions issued *Antitrust Guidance for Human Resource Professionals* ("Guidance"). The Guidance announced that no-poach and wage-fixing agreements will generally be treated as criminal antitrust offenses going forward.

58.    The Guidance states that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects." Guidance at 3.

59.     The action taken by the Department of Justice as to Defendants was the first to follow the issuance of the Guidance.

60.     Beginning in or around 2016, the Antitrust Division of the United States Department of Justice conducted an investigation into the employment practices of Defendants. Because of its investigation, the DOJ concluded that Defendants had agreed to unreasonable restraints of trade that were *per se* unlawful under the antitrust laws.[5]  Specifically, the DOJ said, the no-poach agreements "were facially anticompetitive because they eliminated a significant form of competition to attract skilled labor in the U.S. rail industry."  The DOJ also stated that "these agreements denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

61.     On April 3, 2018, the DOJ filed a complaint alleging that Defendants' No-Poach Conspiracy violated Section 1 of the Sherman Act.  The DOJ also filed a stipulated proposed final judgment in which Wabtec and Knorr agreed that the DOJ's complaint "state[d] a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1."[6]

62.     In the stipulated proposed final judgment, Wabtec and Knorr are "enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision."[7]  Wabtec and Knorr also agreed to comply with a variety of enforcement measures.

---

[5] *See generally* DOJ Press Release and attached documents at https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate-unlawful-agreements-not-compete.
[6] *See id.*
[7] *Id.*

16

63.     The DOJ has not sought monetary penalties of any kind against Defendants and has made no effort to compensate individuals who were harmed by the Conspiracy.  Thus, without this class action, Plaintiff and the Class will be unable to obtain compensation for the harm they suffered, and Defendants will retain the benefits of their unlawful conspiracy.

## VI.    DEFENDANTS' CONSPIRACY TO LIMIT COMPETITION FOR SKILLED LABOR

64.     As part of the conspiracy alleged herein, beginning in no later than January 2009, Defendants entered into the No-Poach Conspiracy to severely limit competition between them for skilled labor by abandoning one of the most effective ways of recruiting employees. Specifically, Defendants agreed not to solicit, recruit, hire without prior approval, or otherwise compete for employees.

65.     This overarching Conspiracy consisted of interconnected agreements that were developed, entered into, and enforced by Defendants' senior executives and reached some of the companies' United States subsidiaries and business units and other co-conspirators.

66.     These no-poach agreements were not reasonably necessary to serve any separate, legitimate purposes for business transactions or collaborations between the companies.

67.     Defendants entered into the express agreements, and into the overarching conspiracy, with knowledge of the other Defendants' participation and with the intent of accomplishing the Conspiracy's objective:  to reduce compensation paid to individuals for their services, including to employees and contractors, by eliminating competition for skilled labor.

### A.     Wabtec-Knorr Agreement

68.     Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions.  Senior executives at the companies' global headquarters

17

and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire each other's employees. These no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate office roles and restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

69.     Beginning no later than 2009, Wabtec and Knorr Brake Company's senior executives entered into an express no-poach agreement and actively implemented it through direct communications with each other. For example, in a letter dated January 28, 2009, a director of Knorr Brake Company wrote to a Wabtec senior executive: "[Y]ou and I both agreed that our practice of not targeting each other's employees is a prudent cause for both companies. As you so accurately put it, 'we compete in the market.'"

70.     While Knorr Brake Company is a Knorr-Bremse AG subsidiary, Knorr-Bremse AG senior executives were aware of the agreement. Top Knorr executives in Germany were also included in key communications about this no-poach agreement.

71.     In furtherance of their agreement, Wabtec and Knorr Brake Company each instructed their outside recruiters not to solicit employees from the other company.

72.     In at least some instances, Wabtec and Knorr Brake Company's no-poach agreement prevented them from considering unsolicited applications from the other firm's employees, unless the other firm gave approval. For example, in 2010, a Knorr Brake Company senior executive stated that, without the permission of his Wabtec counterpart, he would not consider the application of Wabtec employees who had applied to Knorr Brake Company.

73.     This agreement also reached other Wabtec and Knorr subsidiaries. For example,

in July 2012, a New York Air Brake senior executive stated that he could not consider the application of Wabtec employees due to Wabtec and Knorr's no-poach agreement.

74.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements.  For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited an individual at Knorr Brake Company for an opening at Wabtec.  The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

**B.      Knorr-Faiveley Agreement**

75.     Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America entered into an express no-poach agreement that included commitments to contact each other before pursuing employees of the other company.  For example, in October 2011, a Knorr Brake Company senior executive stated in an email to an executive at Knorr-Bremse AG that a conversation with a Faiveley Transport North America executive had "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]"  Executives at Knorr Brake Company and Faiveley Transport North America actively managed the agreement with each other through direct communications.

76.     In or about 2012, executives from Knorr Brake Company and Faiveley Transport North America discussed the no-poach agreement at a trade show in Germany.  Thereafter, the

executives enforced the agreement through direct communications with each other and other senior executives at the two companies.

77.    This no-poach agreement was known to other senior executives at the companies, who directly communicated with one another to ensure adherence to the agreement.  For example, in October 2012, Faiveley Transport North America executives stated in an internal communication that they were required to contact Knorr Brake Company before hiring a train brake engineer in the United States.

### C.    Wabtec-Faiveley Agreement

78.    Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement, which included commitments to notify and obtain approval from each other before hiring each other's employees.

79.    Executives from these two companies enforced their no-poach agreement through direct communication.  For example, in January 2014, a Wabtec Passenger Transit executive explained to his colleagues that he could not engage in hiring discussions with Faiveley Transport North America employees without first getting permission, stating that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]."

80.    Similarly, one month later, another Wabtec Passenger Transit executive informed his staff that hiring Faiveley Transport North America's employees was "off the table" due to the no-poach agreement.

81.    Wabtec announced its intent to acquire Faiveley in July 2015. Wabtec closed its acquisition of Faiveley on November 30, 2016.  Faiveley is now a wholly-owned subsidiary of

Wabtec.

## VII.    DEFENDANTS USED TRADE ASSOCIATIONS TO FURTHER THEIR CONSPIRACY

82.    The railway industry in general is concentrated, insular, and close-knit, and supports a number of industry associations that facilitate interaction, sharing of information, and coordination between its members.  The primary rail associations in the United States include: American Association of Railroad Superintendents (AARS); American Association of State Highway and Transportation Officials (AASHTO); American Public Transportation Association (APTA); American Railway Engineering and Maintenance-of-Way Association (AREMA); American Short Line and Regional Railroad Association (ASLRRA); Association of American Railroads (AAR); National Association of Railroad Passengers (NARP); North American Rail Shippers Association (NARS); and United States High Speed Rail Association (USHSR).

83.    More particularly, within the rail industry, the railway supplier sector organizes through the Railway Supply Institute ("RSI"), an all-inclusive trade association with over 250 railway supplier company members, including Defendants Knorr, Wabtec, and, upon information and belief, Faiveley before it was acquired by Wabtec. RSI facilitates and encourages the sharing of key industry information among its members.  For example, an RSI committee regularly prepares and distributes statistics on North American freight car orders, deliveries, and backlogs to its affiliate members.  According to RSI's most recent Annual Report, Jason Connell of Defendant New York Air Brake and Jeff Stearns of Defendant Wabtec both serve on RSI's Board of Directors. In addition, Jim Frantz of Defendant Wabtec is the Immediate Past President of RSI.

84.    Even more particularly, within railway suppliers, the railway air brake sector, which also includes Defendants Knorr, Wabtec, and Faiveley, organizes through Air Brake Association ("ABA").  A longstanding insular group, the ABA has met regularly since 1893.

21

Defendant New York Air Brake, Defendant Wabtec, and RSI are three of the seven Partners of the ABA.

85.    Upon information and belief, Defendants used these trade associations, including meetings, conventions, and discussions, and their membership and leadership therein to share information, including as to their employees, and to form, reach, confirm, perpetuate, and enforce agreements as to anticompetitive conduct, including in furtherance of their No-Poach Conspiracy.

## VIII.  CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action on behalf of himself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Class is defined as follows:

> All natural persons who were paid for personal services by any of the Defendants, or by any wholly-owned subsidiary of any Defendant, including Defendants' employees or contractors, at any time from January 1, 2009, to April 3, 2018. Excluded from the Class are senior executives and employees in the human resources and recruiting departments of the Defendants and their wholly-owned subsidiaries, as well as employees hired outside of the United States to work outside of the United States.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

87.    Plaintiff does not yet know the exact size of the Class because such information is in the exclusive control of Defendants and the co-conspirators, but based upon the nature of trade and commerce involved, as well as the scope and duration of the conspiracy, Plaintiff believes that there are at least hundreds, if not thousands, of Class members, and that Class members are geographically dispersed throughout the United States.  Therefore, joinder of all members of the Class is not practicable.

88.    The questions of law or fact common to the Class include, but are not limited to:

a.    whether the Conspiracy violated the Sherman Act;

       b.      whether the Conspiracy and associated agreements, or any one of

them, constitute a *per se* violation of the Sherman Act;

       c.      whether Defendants fraudulently concealed their conduct;

       d.      whether the Conspiracy and associated agreements restrained trade,

commerce, or competition for labor;

       e.      whether Plaintiff and the Class suffered antitrust injury or were

threatened with injury; and

       f.      the type and measure of damages suffered by Plaintiff and the Class.

89.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

90.     Plaintiff's claims are typical of the claims of the Class.

91.     Plaintiff will fairly and adequately represent the interests of the Class and has no conflict with the interests of the Class.

92.     Plaintiff has retained competent counsel experienced in antitrust and complex class action litigation to represent himself and the Class.

93.     Defendants and the unnamed co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

94.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.  By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of

conduct for Defendants.

## IX.   EFFECTS OF DEFENDANTS' CONSPIRACY ON PLAINTIFF AND THE CLASS

95.     The No-Poach Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented, and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing the compensation paid to their employees at artificially low levels.

96.     Plaintiff and each member of the Class were harmed by every agreement alleged herein. The elimination of competition and suppression of compensation due to the Conspiracy affected all Class members.  For example, Wabtec employees received lower compensation as a result of not only Wabtec's illicit agreements with Knorr Brake Company, but also as a result of Knorr's agreement with Faiveley, and so on.

97.     The harm not only reached individuals who did, or otherwise would have, changed companies, but also extended to those who had no intention of leaving their companies, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

98.     While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for rail equipment manufacturers and suppliers in the United States.

99.     Wabtec and Knorr, along with their many subsidiaries, are the two largest competitors in this market—and, before its acquisition by Wabtec, Faiveley was the third-largest—and they possess significant market power.  Acting in concert, Defendants and unnamed co-conspirators have the power to suppress compensation and eliminate competition in the

relevant market.

100.    Through their No-Poach Conspiracy, Defendants exercised and maintained this power, and did in fact suppress compensation and eliminate competition.

## X.    PLAINTIFF'S CLAIMS ARE NOT LIMITED BY STATUTES OF LIMITATION

101.    Plaintiff and members of the Class had neither actual nor constructive knowledge of the conspiracy and/or the pertinent facts constituting their claims for relief.

102.    Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least April 3, 2018, when the DOJ's settlement with Defendants became public.

103.    Defendants engaged in a secret conspiracy and did not reveal facts that would put Plaintiff or the Class on inquiry notice of the no-poach agreements.   Plaintiff and Class members have no reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market.

104.    Defendants publicly described themselves as competitors. Wabtec's 2017 Form 10-K listed Knorr as a principal competitor.   Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive."   And in the related commercial vehicle market, Knorr identified WABCO (a trade name of Wabtec) as "its principal competitor."   These statements indicated to Plaintiff that Defendants were competing, not acting as co-conspirators and agreeing not to compete in the market for rail equipment employees.

105.    Wabtec's 2017 10-K also stated that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including "conduct[ing] its business activities within the laws of host countries in which the Company operates."   Knorr's Code of Conduct similarly states that the company "expect[ed] the entire workforce not only to

observe internal regulations but also to observe the law."   These statements indicated that Defendants were acting lawfully, not engaging in a long-running anticompetitive conspiracy to suppress the compensation of their employees.

106.    In its Annual Reports from 2009 through at least 2015, Wabtec identified New York Air Brake as a "principal overall OEM competitor," as well as a competitor for "locomotive, freight and passenger transit service and repair" in North America. From 2013 through at least 2015, Wabtec identified Knorr and Faiveley as its "largest competitors for Brake and Transit products" outside North America.

107.    Defendants took active steps to keep their conspiracy hidden and carried it out in a manner specifically designed to avoid detection.  Defendants' discussions in furtherance of the conspiracy often occurred through direct, private conversations between senior executives or through email exchanges between senior executives or recruiters.  Defendants relied on non-public forms of communication (e.g., private email) to effectuate their conspiracy and to avoid disclosure of the full scope of the conspiracy beyond the individuals involved.

108.    Before the DOJ's announcement, none of the relevant communications between Defendants were public or could have been known to Plaintiff.

109.    As a result of Defendants' successful efforts to conceal the fact and scope of the No-Poach Conspiracy, the running of any applicable statute of limitations has been tolled until April 3, 2018 with respect to Plaintiff's claims concerning Defendants' conspiracy.

## XI.    VIOLATION OF SECTION 1 OF THE SHERMAN ACT

110.    Plaintiff incorporates by reference the allegations in the preceding paragraphs, and further alleges the following:

111.    Beginning no later than January 2009 and continuing until on or around April 3,

2018, Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.    Defendants' agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of:  (a) fixing the compensation of Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

113.    As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, Plaintiff and members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

114.    The unlawful agreements among Defendants and their co-conspirators have had the following effects, among others:

   a.    competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

   b.    Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of the Conspiracy and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

115.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

116.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

27

117.    Accordingly, Plaintiff and Class members seek three times their damages caused by Defendants' violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Defendants from ever again entering into similar agreements in violation of the antitrust laws.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel as Class counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

B.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

1.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

2.    A *per se* violation of Section 1 of the Sherman Act;

C.    Plaintiff and the Class recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Defendants be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or

28

effect;

E.        Plaintiff and members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.        Plaintiff and members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

G.        Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues so triable.


Dated: July 23, 2018

/s/ *Jennifer Duncan Hackett*
Jennifer Duncan Hackett  (Bar No. 16841)
James R. Martin *(pro hac vice forthcoming)*
Miriam R. Vishio (Bar No. 17171)
ZELLE LLP
1775 Pennsylvania Avenue, NW, Suite 375
Washington, D.C. 20006
Tel: (202) 899-4100
jhackett@zelle.com
jmartin@zelle.com
mvishio@zelle.com


Christopher T. Micheletti *(pro hac vice forthcoming)*
Judith A. Zahid *(pro hac vice forthcoming)*
Qianwei Fu *(pro hac vice forthcoming)*
Heather T. Rankie *(pro hac vice forthcoming)*
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel: (415) 693-0700
cmicheletti@zelle.com
jzahid@zelle.com

29

qfu@zelle.com
hrankie@zelle.com

***Attorneys for Plaintiff and the Proposed Class***